## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOANN WARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-481-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, JoAnn Ward ("Ward"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Ward appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Ward was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on June 25, 2009, Ward was 50 years old.  (R. 29).  Ward had an eleventh grade education.  (R. 30).  She was able to read the newspaper and to make correct change.  *Id.*  In 2006, she had done janitorial work for two weeks, but quit because the work was too hard.  (R. 31-32).  Lifting heavy trash bags hurt her back, the amount of

1

walking hurt her feet, and the work hurt her hands.  (R. 33).  Before that, she had worked at a silk

screening company from 1996 to 2005 doing cleaning work and eventually working as a silk

screener.  *Id.*

When asked to list the reasons why she could not work, Ward first said arthritis, and she

testified that the arthritis affected her feet, knees, back, shoulder, and hands.  (R. 35).  She also

listed hepatitis C, diabetes, and depression as reasons for her disability.  (R. 35-36).  Regarding

her diabetes, Ward testified that she was taking oral medications.  (R. 36).  She thought the

diabetes contributed to her tiredness and lack of energy.  (R. 36-37).  She had not received any

treatment for her hepatitis C, and she was not sure if it contributed to her tiredness.  (R. 37).

Ward testified that the pain in her back was from arthritis or from a previous injury, and it

made it difficult to sit for long periods of time.  (R. 37-38).  The pain was in the middle of her

back.  (R. 38).  She had not received any recommendations for surgery.  *Id.*  She could touch her

knees, but not her toes.  *Id.*  It was difficult to squat and get back up, and she would need to hold

on to something.  *Id.*  She did not have much difficult going up and down stairs.  (R. 39).

Ward testified that her hands got "inflamed," she had trouble closing them, and her

fingers and thumb, especially of her right hand, would "lock up."  *Id.*  Ward had been diagnosed

with trigger finger.[1]  (R. 54).  This happened three times a week and took about five minutes for

them to unlock.  *Id.*  Ward said that she dropped items sometimes, and she had switched to

plastic cups for that reason.  (R. 54-55).  When asked if she would be able to pick up poker chips

at a casino, Ward testified that she would, but with some difficulty.  (R. 40).  Sometimes it was

---

[1] Trigger finger is a "state in which flexion or extension of a digit is arrested temporarily but finally completed with a jerk."  Taber's Cyclopedic Medical Dictionary 2042 (17th ed. 1993).

difficult for her to grip and manipulate small items like as a pen or a tooth pick, especially if her hands were inflamed.  (R. 54-55).  If she mowed the grass for ten minutes, her hands would feel really inflamed.  (R. 56).  She testified that cold weather affected her hands.  (R. 42).  Ward used an Icy Hot Pack on her hands four to five times a day, and she took naproxen each day.  (R. 49, 56-57).  When asked if she had trouble reaching, she said that she had trouble with her right shoulder at times during the night, but she did not have trouble during the day.  (R. 41).  She testified that it would be difficult for her to change a lightbulb above her head with her right hand, and she would use her left instead.  (R. 46).

Ward testified that standing was difficult due to pain in her feet.  (R. 42).  At her job silk screening, Ward had been used to standing eight hours a day, but in her last year there, standing became painful, and she stood less.  *Id.*  She testified that at the time of the hearing, she could stand for 10 or 15 minutes before needing to sit down to rest.  (R. 43).  She could walk for about three blocks, and she testified that she did that regularly as exercise due to her diabetes.  *Id.*

Ward testified that she could not lift or carry 20 pounds of potatoes, but she could lift and carry a 10-pound bag of sugar.  *Id.*  She could sit for about 15 minutes before needing to stand up.  (R. 44).  She testified that her knees sometimes got weak when she walked, and she had fallen twice.  (R. 44-45).

Ward testified that she had depression and anxiety, and her medications had helped with crying spells.  (R. 46).  She thought that her counseling sessions were helpful, too.  (R. 46-47).  She testified that she had once been taken to Parkside, but was released after she agreed not to harm herself.  (R. 47).  Ward had days when she did not want to go outside and did not want to talk to anyone.  (R. 47-48).  She testified she had trouble with memory and concentration, such as going to the kitchen and forgetting why she went there.  *Id.*

Ward testified that she had quit drinking alcohol and using methamphetamine in about 2002.  (R. 48-49).

Ward had difficulty falling asleep at night, because she could not "shut down" her mind. (R. 51-52).  During the day she spent about fifty percent of her time lying down, which was her most comfortable position.  (R. 57).  Because she was not able to sit for an hour, Ward said that to watch an hour of television, she would alternate between a sitting and a reclining position.  *Id.* She sometimes took a two-hour nap in the day.  (R. 52).

Ward testified that when she went to the grocery store, she had someone go with her to carry what she bought.  (R. 50).  She was able to cook, wash the dishes, and vacuum.  (R. 49-50). Someone else did the sweeping and mopping for her.  (R. 50).  She did not do the laundry, garden, or do yard work.  (R. 49-51).  She watched television, but she no longer read for pleasure because she was unable to concentrate and had to read a paragraph over and over.  (R. 50).  She primarily stayed home, but she visited with friends and family and occasionally attended church services.  (R. 43, 50-51).

The record reflects that Ward was treated at Indian Health Care Resource Center of Tulsa (the "Tulsa Clinic") from 1997 to 2009.  (R. 228-76, 311-428).  Ward presented to the Tulsa Clinic on March 22, 2000 and reported that she had chronic Hepatitis C and had old exposure to Hepatitis A.  (R. 369).  When Ward was seen on April 20, 2000, she was diagnosed with diabetes mellitus, type II.  (R. 367-68).  She was instructed how to monitor and to control her blood sugar. *Id.*

The majority of the records from the Tulsa Clinic from 2000 to 2009 were of Ward's diabetes check-ups.  (R. 311-428).  During this time, Ward's blood sugar levels were sometimes described as controlled and sometimes described as uncontrolled.  *Id.*

4

Ward was seen at the Tulsa Clinic on July 15, 2002 with problems with a low mood.  (R. 348).  Ward reported that she had been crying and yelling.  *Id*.  The doctor diagnosed her with depression.  *Id*.  At an appointment on August 19, 2002, Ward was diagnosed with dyslipidemia[2]. (R. 347).  In the fall of 2003, she reported that she had problems with sleep disturbances and mood swings.  (R. 338-39).  She also reported abdominal pain and leg pain.  *Id*.  On August 16, 2004, Ward complained of a painful "catching" sensation of the fourth finger on her left hand. (R. 254).  The problem had increased to the point where she could no longer flex her finger completely.  *Id*.  She reported that she had to release her finger by manually pulling it out of the locked position.  *Id*.  The doctor diagnosed Ward with trigger finger.  *Id*.  On November 16, 2006, Ward had complaints of pain in her feet.  (R. 242, 328).

On August 8, 2007 at the Tulsa Clinic, it was noted that Ward was not in good compliance, but that she wanted to get her diabetes under control.  (R. 327).  The note says that the practitioner discussed the importance of medications, diet, and exercise in the management of her diabetes, hypertension, and lipids.  *Id.*  Ward's blood pressure was recorded at 168/84.  *Id*. She was diagnosed with diabetes, hypertension, and dyslipidemia, and she was prescribed medication.  *Id*.

Ward presented to the emergency room at PHS Indian Hospital in Claremore on September 21, 2007.  (R. 228, 232-33).  She reported that she had fallen two weeks earlier and had experienced back pain.  (R. 228).  An x-ray of her lumbosacral spine was negative for evidence of acute trauma, but also indicated an "incidental finding of modest degenerative change."  (R. 232).

---

[2] Dyslipidemia is an the abnormality in, or abnormal amounts of, lipids and lipoprotein in the blood.  Dorland's Illustrated Medical Dictionary 586 (31st ed. 2007).

On November 9, 2007, Ward was counseled at the Tulsa Clinic as part of a diabetes education program. (R. 236, 326). She was given a new glucometer and was instructed on how to use it. *Id.* Ward was seen on November 15, 2007, for a diabetic exam. (R. 325). This record states that Ward was doing "ok" with her diabetes medications, but she felt depressed, tearful, and lacking in energy. *Id.* The record states that she had not been drinking alcohol for six years "and no drugs recently either." *Id.* On examination, it was noted that Ward had "some" metacarpophalangeal joint hypertrophy bilaterally. *Id.*

On March 24, 2008, Ward was again counseled at the Tulsa Clinic in the diabetes education program. (R. 322). She reported that she was not feeling well because she was out of her medication for depression. *Id.* She also reported that she had not been monitoring her blood sugar or closely following recommendations regarding exercise and nutrition. *Id.* She had complaints of loss of sensation in her upper leg. *Id.* She was seen for a diabetic exam on April 3, 2008, and she complained of stiffness and pain in her right shoulder. (R. 321). She said that Aleve was very helpful. At a diabetes education appointment on July 2, 2008, Ward complained of arthritis in her right shoulder and hand. (R. 320). She was seen for a diabetic exam on July 15, 2008, but her main concern was her right shoulder. (R. 319). On examination, it was noted that Ward's right shoulder was tender, with crepitus and weakness. *Id.* Ward's feet had mild callous formation. *Id.*

Ward was seen at the Indian Health Care Behavioral Health Department on August 8, 2008 for individual counseling. (R. 427). Ward reported that Zoloft was not working as well as it had, and she had crying spells and agitation. *Id.* The counselor assessed Ward with major depressive disorder, recurrent, moderate. *Id.* The dosage of Ward's Zoloft was increased. *Id.* On August 22, 2008, Ward reported that she was doing "okay," she hadn't experienced problems,

and she was working in the yard a lot.  (R. 425).  When Ward was seen in September and October, she was tearful and had a down affect.  (R. 422-24).  Ward questioned if her medications needed to be increased because she had been crying more and had been more depressed.  (R. 422).  She reported that she had problems sleeping.  *Id.*  Ward was prescribed a sleep aid.  *Id.*  On December 12, 2008, she reported that she was doing "okay."  (R. 420).  The counselor's assessment, major depressive disorder, recurrent, moderate, remained the same through these 2008 appointments.  (R. 420-27).

Ward continued to see the counselor in 2009, and in many sessions she said that her medications were helping her, but she had continued to have problems with crying spells.  (R. 412-13, 415, 422, 425).  The counselor noted on several occasions that Ward was tearful during her sessions. (R. 422-24).  Ward reported stress related to her diabetes.  (R. 413, 416, 418).  On March 13, 2009, Ward was walking and getting out more due to warmer weather.  (R. 414).  On June 19, 2009, Ward told her counselor that she had felt "really good lately."  (R. 428).  Ward was given a continued diagnosis of major depressive disorder, recurrent, moderate.  *Id.*

At a diabetic education appointment on February 11, 2009, Ward reported that she had problems with her memory and could not remember to test her blood sugar.  (R. 315).  On June 26, 2009, x-rays were taken of Ward's lumbar spine and hips due to her ongoing complaints of back pain.  (R. 430-34).  The x-rays of her hips were normal.  (R. 433-34).  The x-rays of her lumbar spine showed mild facet arthrosis at the L5/S1 level and osteopenia.[3]  (R. 432).

Agency examining consultant Michael D. Morgan, Psy.D., completed a mental status examination of Ward on January 10, 2008.  (R. 277-81).  In discussing her history with Dr.

_____

[3] Osteopenia refers to reduced bone mass.  Dorland's Illustrated Medical Dictionary 1369 (31st ed. 2007).

Morgan, Ward said that she was unable to work because of swelling in her feet and her hands. (R. 277).  She said that she was unable to stand because her feet hurt her.  *Id*.  Ward told Dr. Morgan that her problems started to interfere with her ability to work in 2000.  (R. 277).  She related problems with fatigue, and she said she was sleeping 8 to 14 hours a day.  (R. 278).  She said that she had a low energy level.  *Id.*  She reported that she felt depressed most of the time and had a reduced interest in pleasurable activities.  *Id*.  She stated that she had gained 20 pounds in the past year.  (R. 278-79).  Ward believed that her depression was related to her medical condition and her reduced level of functioning.  (R. 279-80).  She told Dr. Morgan that she needed assistance to perform her necessary household chores and that she required more time to do the rest.  (R. 278).  She was occasionally able to engage in strenuous activities.  *Id*.

On examination, Dr. Morgan found that Ward's memory and concentration were within normal limits.  (R. 279).  Ward's mood was moderately depressed and that her affect was restricted.  *Id.*  Dr. Morgan said that Ward's level of education indicated that she operated at the low-average level of intelligence.  *Id.*  Ward's judgment was good, and her insight was fair.  *Id.* On Axis I[4] Dr. Morgan assessed adjustment disorder with depressed mood, chronic.  (R. 280). Dr. Morgan scored Ward's Global Assessment of Functioning ("GAF") as 56-60.[5]  *Id*.  He said

_____

[4] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[5] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM-IV 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id*.   A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

that with appropriate treatment Ward should demonstrate a higher level of psychological functioning in less than one year.  *Id.*

Non-examining agency consultant, Carolyn Goodrich, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on January 24, 2008.  (R. 282-99).  On the Psychiatric Review Technique form, for Listing 12.04, Dr. Goodrich assessed that Ward had depressive syndrome and depression not otherwise specified.  (R. 289). For the "Paragraph B Criteria,"[6] Dr. Goodrich found that Ward had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 296).  In the "Consultant's Notes" portion of the form, Dr. Goodrich noted that Ward received medications from her treating physician with no referrals to a mental health professional.  (R. 298).  Dr. Goodrich briefly summarized the report of Dr. Morgan.  *Id.*  Dr. Goodrich summarized Ward's activities of daily living that were reflected in forms completed as part of the application process.  *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Goodrich found that Ward was markedly limited in her ability to understand, remember, and carry out detailed instructions.  (R. 282).  She also found that Ward was moderately limited in her ability to interact appropriately with the general public. (R. 283).  In her narrative comments, Dr. Goodrich said

---

[6] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of ADLs, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

that Ward was limited to simple one- and two-step tasks due to her continued symptoms of

depression.  (R. 284).  Dr. Goodrich said that Ward was "limited to superficial interactions," due

to the stress of social interactions.  *Id.*  She said that Ward could adapt to work that included

these accommodations.  *Id.*

Agency examining consultant Jason Lindsey, D.O., completed a physical examination of

Ward on February 17, 2007.  (R. 220-26).  Ward's chief complaint was chronic bilateral foot and

hand pain.  (R. 220).  Ward reported that she had tried various medications and shoes, with little

relief.  *Id.*  Ward said that rest gave her the most relief, but that her feet still hurt while sitting.

*Id*.  Upon examination, Dr. Lindsey noted that Ward's gait was appropriate to speed, and that she

walked without any assistive devices.  (R. 222).  Ward moved about the examination room

easily.  *Id.*  Her toe and heel walking was normal bilaterally.  *Id.*  She had mid-foot and toe pain

with plantar flexion in her left foot.  (R. 225).  He reported that Ward had great toe strength equal

bilaterally rated at 5/5.  (R. 221).  Dr. Lindsey said that Ward had full range of motion with some

limitations, including limited rotation of the cervical spine, external rotation of the shoulders,

finger flexion of the middle phalanges, and hyperextension to proximal phalanges bilaterally.  (R.

222).  Her fine tactile manipulation was normal.  *Id.*  Dr. Lindsey's assessments were

osteoarthritis with chronic bilateral hand and foot pain; hyperlipidemia; diabetes; hypertension;

hepatitis C, asymptomatic; distant intravenous drug abuse "(Cocaine- quit 10 years ago)";

tobacco abuse; alcohol abuse "(quit 5 years ago)".  *Id.*

Agency non-examining consultant, Luther Woodcock, M.D., completed a Physical

Residual Functional Capacity Assessment dated August 20, 2008.  (R. 301-08).  Dr. Woodcock

determined that Ward had the exertional capacity to perform light work.  (R. 302).  In his

narrative comments, he briefly summarized Ward's history and treatment.  (R. 202).  He

summarized Dr. Lindsey's report at some length. (R. 302-03).  Dr. Woodcock wrote that Ward's

hepatitis was asymptomatic, and he noted lab results from November 2006.  Dr. Woodcock

found that no other limitations were established.  (R. 303-08).

## Procedural History

Ward filed applications on November 1, 2007 seeking disability insurance benefits and

supplemental security income under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*.  (R. 129-40).

Ward's alleged onset of disability on July 1, 2005.  (R. 133).  The applications were denied

initially and on reconsideration.  (R. 77-85, 88-93).  A hearing before ALJ Gene M. Kelly was

held June 25, 2009 in Tulsa, Oklahoma.  (R. 21-70).  By decision dated August 21, 2009, the

ALJ found that Ward was not disabled.  (R. 10-20).  On June 10, 2011, the Appeals Council

denied review of the ALJ's findings.  (R. 1-4).  Thus, the decision of the ALJ represents the

Commissioner's final decision for purposes of this appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[7]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

its weight.'"  *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court

"may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[7] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

### Decision of the Administrative Law Judge

The ALJ found that Ward met insured status through March 31, 2011.  (R. 12).  At Step One, the ALJ found that Ward had not engaged in any substantial gainful activity since her alleged onset date of July 1, 2005.  *Id*.  At Step Two, the ALJ found that Ward had severe impairments of diabetes, hepatitis C, liver problems, depression, anxiety, and problems with her back, neck, feet, hands, knees, and shoulders.  *Id*.  At Step Three, the ALJ found that Ward's impairments did not meet a Listing.  (R. 13).

The ALJ determined that Ward had the RFC to perform "sedentary/light work" with the following exceptions:

> except lift/carry 20 pounds; stand/walk for six hours out of an eight hour workday, 30 minutes at one time; sit for six hours out of an eight hour day, one hour at a time; limited squatting and kneeling; occasionally bend, stoop, crouch, climb, crawl, operate foot controls, and push/pull with right upper extremity.  She has slight limitation in fingering/feeling/gripping and reaching overhead with right upper extremity; need to avoid rough uneven surfaces, unprotected heights, fast and dangerous machinery, and cold, damp environments.  Mentally, the client is able to do simple, repetitive and routine work with slight limitation with contact with public.

(R. 15).  At Step Four, the ALJ found that Ward was unable to perform any past relevant work.

(R. 18).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Ward could perform, considering her age, education, work experience, and RFC.

(R. 19).  Therefore, he found that Ward had not been disabled from July 1, 2005 through the date of the decision.  *Id.*

## Review

Ward argues that the ALJ's decision is erroneous for several reasons relating to Step Five, the opinion evidence, and the ALJ's credibility assessment.  Because the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements, the ALJ's decision is affirmed.

## Issues Relating to Step Five

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account her age, education, work experience and RFC.  *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of a vocational expert (the "VE").  *Id.* at 1089.  Ward makes several arguments that the ALJ's hypothetical did not relate with precision all of Ward's impairments, and therefore the testimony of the VE did not constitute substantial evidence. *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991).  Ward also attacks the accuracy of the VE's testimony that a person with Ward's RFC could perform the identified jobs.

Ward first attacks the testimony of the VE on the basis that her limitations as to reaching would prevent her from being able to perform the identified jobs.  The difficulty with Ward's argument is that the record shows that both the ALJ and the VE carefully considered Ward's reaching limitations.  (R. 58-66).  The ALJ first made a hypothetical inquiry that did not include right upper extremity limitations.  (R. 58-63).  The ALJ then gave a second hypothetical that included occasional "push-pull with the right upper extremity" and "slight limitation in reaching overhead with the right upper extremity."  (R. 64).  The VE asked for clarification, and there was an exchange between the ALJ and the VE.  (R. 65).  The VE then testified that he would reduce one identified job by 50%, but the other jobs would not be affected.  (R. 65-66).  The VE testified

that he could not think of other factors that would affect his testimony.  (R. 66).  The ALJ asked

the VE if there were any deviations from the Dictionary of Occupational Titles (the "DOT") that

the VE needed to explain, and the VE answered in the negative.  (R. 67).

In the face of an RFC that carefully addresses Ward's limitations with respect to her right

arm and shoulder, and a transcript that reflects that the VE clarified the ALJ's hypothetical and

then gave his testimony of the numbers of jobs that Ward could still perform, Ward insists that

the DOT's descriptions of these jobs show that she cannot perform them.  She says that all of

these jobs require frequent or constant reaching, and therefore she cannot perform them.  Ward's

argument is that the Court should overrule the testimony of the VE and act as a fact-finder in the

first instance.  Such a role is not within the statutory mandate for this Court.  42 U.S.C. § 405(g)

("The findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive"); *Allen v. Barnhart,* 357 F.3d 1140, 1143-45 (10th Cir. 2004)

(court acts within confines of its administrative review authority).  "The whole point of

vocational testimony is to go beyond facts already established through publications eligible for

judicial or administrative notice and provide an alternative avenue of proof."  *Rogers v. Astrue*,

312 Fed. Appx. 138, 142 (10th Cir. 2009) (unpublished), *citing Gay v. Sullivan*, 986 F.2d 1336,

1340 (10th Cir. 1993).  Here, as in *Rogers*, the VE explained his expert opinions as to how the

limitations the ALJ found regarding Ward's upper extremity would affect the numbers of jobs

available, and his testimony was substantial evidence upon which the ALJ was entitled to rely.

Ward next states that she could not perform the job of mail clerk because it had a

reasoning level of three, and a person restricted to simple and repetitive tasks could not perform

at that reasoning level.  *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005).  Even

without this job included in the evidence supporting the ALJ's Step Five finding, the VE

identified many other jobs that Ward does not contest with this argument.  The remaining jobs are still sufficient for purposes of Step Five.  *See Conger v. Astrue*, 453 Fed. Appx. 821, 827-28 (10th Cir. 2011) (unpublished) (even if reasoning level three jobs were unavailable, remaining jobs were sufficient).

Ward's next argument is based on the Paragraph B Criteria findings of the ALJ at Step Three.  She complains that while the ALJ found she had moderate limitations in social functioning, concentration, persistence, or pace, and activities of daily living the "the ALJ did not consider any of these limitations specifically in his hypotheticals to the VE as required." Plaintiff's Opening Brief, Dkt. #12, p. 3.  Ward's arguments relating to the Paragraph B criteria are not persuasive.  The Paragraph B Criteria are only 4 broad categories, while the Mental Residual Functional Capacity Assessment includes 20 different specific functions that are listed under headings of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation."  A finding of moderate limitation in concentration, persistence, or pace in the Paragraph B Criteria does not require any specific one-for-one correlation to a function on the Mental Residual Functional Capacity Assessment.  *See Heinritz v. Barnhart*, 191 Fed. Appx. 718, 721-22 (10th Cir. 2006) (unpublished) (finding only three of twenty specific mental activities were impaired on the Mental Residual Functional Capacity Assessment was not inconsistent with a finding that the claimant had marked limitation of concentration, persistence, or pace on the Psychiatric Review Technique form).

In multiple cases before this Court, the undersigned has observed that counsel for Ward have attempted to merge the Paragraph B Criteria reflected on the Psychiatric Review Technique form and used at Step Three with the functional criteria reflected on the Mental Residual Functional Capacity Assessment form that is used at Steps Four and Five.  These attempts

disregard the different purposes of these forms.  In 1996, the Social Security Administration

explained these different purposes:

> The adjudicator must remember that the limitations identified in the "paragraph
> B" and "paragraph C" criteria are not an RFC assessment but are used to rate the
> severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation
> process.  The mental RFC assessment used at steps 4 and 5 of the sequential
> evaluation process requires a more detailed assessment by itemizing various
> functions contained in the broad categories found in paragraphs B and C of the
> adult mental disorders listings in 12.00 of the Listing of Impairments, and
> summarized on the [Psychiatric Review Technique form].

Social Security Ruling 96-8P, 1996 WL 274184 *4.  The undersigned rejects the attempts of

counsel to blur the lines between these two forms and their different purposes.  Here, the ALJ

addressed Ward's mental functions by limiting her to simple, repetitive and routine work with a

slight limitation with contact with the public.  (R. 15).  This finding by the ALJ is consistent with

the findings of Dr. Goodrich on her Mental Residual Functional Capacity Assessment.  (R. 282-

84).  The ALJ's RFC, and his hypotheticals to the VE, are therefore supported by substantial

evidence.

The ALJ's findings at Step Five were supported by substantial evidence and complied

with legal requirements.

**Issues Relating to Opinion Evidence**

Ward's next argument is similar to her argument that the Paragraph B Criteria were not

included in the hypothetical to the VE.  She argues that because Dr. Goodrich, the nonexamining

agency consultant, found for the Paragraph B Criteria that Ward had a moderate restriction in her

concentration, persistence, or pace (R. 296) that Dr. Goodrich was required to find that Ward had

a limitation in her ability to maintain attention and concentration for extended periods, a specific

function included on the Mental Residual Functional Capacity Assessment form (R. 282).   A

one-for-one correlation of those two items would be absurd, given the different structure and purpose of the two forms, as discussed above. While Dr. Goodrich found that Ward had a moderate restriction in her concentration, persistence, or pace, that does not mean that she was required to find an impairment in all eight of the specific functions listed under the heading of "sustained concentration and persistence" on the Mental Residual Functional Capacity Assessment form. It was Dr. Goodrich's job to find which specific functions were implicated by Ward's concentration issues, and she made that finding: that Ward was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 282). That Dr. Goodrich's opinion did not include the other specific function identified by Ward is not a conflict in her opinion evidence.

Ward's final point regarding the opinion evidence of Dr. Goodrich and Dr. Woodcock is that the ALJ failed to "weigh" them and to sufficiently consider them. The ALJ stated concisely that the opinions were given "considerable weight. They are basically consistent with the [RFC] adopted in this decision." (R. 18). The Tenth Circuit recently rejected Ward's argument in a similar case:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence. Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).

The ALJ's evaluation of the opinion evidence complied with legal requirements.

**Credibility**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

While the ALJ's credibility assessment was minimal, the Court finds it adequate.  *Cobb v.*

*Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility

assessment was summary, taking the decision as a whole the ALJ's findings regarding the

claimant's testimony were "clear enough" without violating rule against *post hoc* justification).

The ALJ stated the following[8] in discussing Ward's credibility:

> [Ward] stated she could not sit, walk or stand for more than 15 to 20 minutes at
> one time; however, there is no evidence in the record that would indicate this
> statement was true.  Her consultative examination showed only mild impairments.
> In addition, her problems with her diabetes were mainly her own fault for not
> being compliant.
>
>       . . .

---

[8] Ward faults the introductory language used by the ALJ: "After careful consideration of
the evidence, the undersigned finds that the claimant's medically determinable impairments
could reasonably be expected to cause the alleged symptoms; however, the claimant's statements
concerning the intensity, persistence and limiting effects of these symptoms are not credible to
the extent they are inconsistent with the above residual functional capacity assessment."  (R. 17).
While this language might have been "meaningless boilerplate," it was merely an introduction to
the ALJ's analysis and was not harmful.  *See Keyes-Zachary*, 695 F.3d at 1170 (use of boilerplate
language in a credibility assessment is problematic only "in the absence of a more thorough
analysis") (further quotations omitted).

In sum, the above [RFC] is supported by the medical records from Tulsa Urban Clinic and the consultative examinations.  The records from the clinic indicate the claimant's non-compliance and the lack of severity of her arthritic symptoms.

(R. 18).

In finding Ward less than fully credible, the ALJ's first reason was that the objective medical evidence did not support her claim of disabling limitations in her ability to sit, walk, and stand.  Contrast between the claims of the claimant and the medical evidence of record is a legitimate reason for an ALJ to use in a credibility assessment.  *Keyes-Zachary*, 695 F.3d at 1169-71 (affirming credibility assessment in part because the ALJ detailed "medical observations reflecting only limited impairment"); 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in relation to the objective medical evidence").  The ALJ gave the examples of Dr. Lindsey's consultative examination and the records of the Tulsa Clinic as not supporting the severity of Ward's claims of functional limitations due to her arthritis.  This first reason supporting the ALJ's credibility assessment was legitimate and was linked to substantial evidence.

The ALJ's second reason for finding Ward less than fully credible was her lack of compliance in managing the symptoms of her diabetes.  (R. 18).  In *Romero v. Astrue*, 242 Fed. Appx. 536, 543 (10th Cir. 2007) (unpublished), the Tenth Circuit approved a credibility assessment that was based in part on the claimant's non-compliance with diet.  In *Kruse v. Astrue*, 436 Fed. Appx. 879, 887 (10th Cir. 2011) (unpublished), the court rejected a claim that the ALJ showed prejudice in noting her failure to quit smoking.  Instead, the court said that the ALJ found the claimant's behavior to be inconsistent with her claim that her asthma was disabling.  *Id.*  In Ward's case, it was legitimate for the ALJ to find that Ward's failure to comply with repeated medical instructions regarding her diabetes undermined her claim that her diabetes

contributed to her disabling medical condition.

Thus, the ALJ gave legitimate reasons for his credibility assessment, and those reasons were closely linked to substantial evidence.  *Kepler*, 68 F.3d at 391; *Keyes-Zachary*, 695 F.3d at 1167 ("common sense, not technical perfection, is our guide").

In attempting to undermine the ALJ's credibility assessment, Ward first makes several arguments regarding activities of daily living, such as a complaint that minimal activities of daily living are not indicative of an ability to work full time.  Plaintiff's Opening Brief, Dkt. #12, pp. 6-7.  Activities of daily living were briefly discussed by the ALJ in relationship to the Paragraph B Criteria, but they were not a basis for his credibility assessment.  (R. 14-18).  Ward's arguments in this regard are therefore not persuasive.

Regarding the issue of non-compliance, Ward argues that the ALJ was required to follow the four-part *Frey* test.[9]  Plaintiff's Opening Brief, Dkt. #12, pp. 7-8.  Ward's argument misses the point, because the *Frey* test is required in those instances in which the ALJ finds that the claimant is disabled, but if the claimant were in compliance, the claimant would not be disabled. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000); 20 C.F.R. § 404.1530 ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work").  Here, this was not the reasoning of the ALJ, but rather he found Ward's failure to comply in treating her diabetes to be significant in weighing the credibility of her statements that her diabetes contributed to her alleged disabled condition.  The ALJ's reasoning was legitimate regarding credibility, and it did not require application of the four-part *Frey* test.

---

[9] The prongs of this test are: "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the whether the refusal was without justifiable excuse." *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir.1987).

Ward argues that the ALJ's characterization of Dr. Lindsey's examination as showing only "mild" impairments is incorrect and crosses the line into giving his own medical opinions. The Tenth Circuit rejected a similar argument when a claimant complained that the ALJ was inaccurate in stating that x-rays showed "no significant pathology." *Keyes-Zachary*, 695 F.3d at 1172. The court found that the evidence, including the consultative examination of the claimant, supported the ALJ's characterization. *Id.* Here, Dr. Lindsey's report is similar to the consultative examination in *Keyes-Zachary*. Upon examination, Dr. Lindsey noted that Ward moved about the examination room easily. (R. 222). Her fine tactile manipulation was normal. *Id.* Under these circumstances, the evidence supports the ALJ's characterization of Dr. Lindsey's report as showing only "mild" problems.

Ward also argues that the ALJ should have given her credit for the fact that some of her complaints were substantiated by the record. Plaintiff's Opening Brief, Dkt. #12, pp. 8-9. In a recent case, the claimant made a similar argument, asserting that in assessing credibility the ALJ should have taken into account evidence of her injuries such as a broken foot and strained neck. *Zaricor-Ritchie v. Astrue*, 452 Fed.Appx. 817, 824 (10th Cir. 2011) (unpublished). The court found that evidence of these injuries "lends no support to the credibility of her testimony regarding the severity" of other impairments. *Id.* Even if records validated some of Ward's complaints, it does not follow that the ALJ would have been required to find that Ward's other complaints were credible.

Ward's multiple arguments regarding the ALJ's credibility assessment constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett*, 395 F.3d at 1173; *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th

Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence).  All of the arguments made by Ward essentially are that Ward would like for this Court to give more weight to the evidence that is in her favor and less weight to the evidence that disfavors her claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 16th day of November 2012.

Paul J. Cleary
United States Magistrate Judge